Richard Grimm
Cal. Bar No. 177463
**LAW OFFICE OF RICHARD GRIMM**
2391 The Alameda, Suite 200
Santa Clara, CA 95050
650.248.5487 (tel)
650.618-9856 (fax)
richard@richardgrimm.com

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **GARRY DRUMMOND**, 4089 Fallwood Court, Pleasanton, CA 94588, | Case No.: _____ |
| **Plaintiff,** | |
| **vs.** | **VERIFIED COMPLAINT** |
| **MOTOROLA SOLUTIONS, INC.,** 1303 E. Algonquin Road, Schaumburg, IL 60196, **and** | |
| **ZEBRA TECHNOLOGIES CORPORATION,** 3 Overlook Point, Lincolnshire, IL 60069, | |
| **Defendants.** | |

Plaintiff Garry Drummond ("Plaintiff"), by and through undersigned counsel, states the following for his complaint against Motorola Solutions, Inc. ("MSI" or the "Company") and Zebra Technologies Corporation ("Zebra").

## **INTRODUCTION**

This action arises out of MSI's failure to honor its commitment to pay Plaintiff commissions earned on a $33 million order he booked in 2013. The Company employed Plaintiff as a Sales Account Manager from 2008 until he was forced to resign on July 25, 2014. In

accordance with the Company's compensation policy, Plaintiff should have received commissions in excess of $1 million dollars. No sooner had the ink dried on the $33 million contract than the Company acted to prevent Plaintiff from receiving the compensation he had earned. First, the Company reneged on assurances it had made to Plaintiff that a contract which was signed in 2013 would constitute a "booking," entitling him to a commission. On information and belief, the Company's characterization of the booked order differed from Motorola, Inc.'s characterization when it sold the Company in 2014. Second, the Company transferred him to a different division in order to deprive him of that part of his commission based on revenue. Plaintiff's immediate supervisor "demoted" himself in order to collect those commissions himself. As a result of the Company's conduct in violation of applicable law and Motorola, Inc.'s Code of Professional Conduct, Plaintiff was forced to resign. By this action, Plaintiff seeks the commissions he earned, attorneys' fees, and punitive damages.

## PARTIES

1.      Plaintiff is a natural person residing at 4089 Fallwood Court, Pleasanton, California 94588.

2.      Defendant Motorola Solutions, Inc., is a corporation organized and exiting pursuant to the laws of the State of Delaware, having its principal place of business at 1303 E. Algonquin Road, Schaumburg, Illinois 60159.

3.      Defendant Zebra Technologies Corporation, is a corporation organized and existing pursuant to the laws of the State of Delaware, having its principal place of business

at 3 Overlook Point, Lincolnshire, Illinois 60069. Upon information and belief, Zebra Technologies Corporation is the successor and to Motorola Solutions, Inc., and is liable for the acts and omissions of Motorola Solutions, Inc., alleged herein.

## JURISDICTION AND VENUE

4.     This Honorable Court has subject matter jurisdiction over the within action pursuant to 28 U.S.C. § 1332(a)(1) because the Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

5.     This Honorable Court has personal jurisdiction over Defendant MSI pursuant to Fed. R. Civ. P. 4 and Cal. Code Civ. Proc. §410, because Plaintiff's claims arise out of its activities in California.

6.     This Honorable Court has personal jurisdiction over Defendant Zebra pursuant to Fed. R. Civ. P. 4 and Cal. Code Civ. Proc. §410, because Plaintiff's claims arise out of its activities in California.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this judicial district

## FACTUAL ALLEGATIONS

8.     MSI is a data communications and telecommunications equipment provider headquartered in Schaumburg, Illinois. Its business includes designing, installing, operating, and maintaining secure local and wide area networks.

9.     Zebra is the successor in interest to MSI and is liable for the acts and omissions of MSI alleged herein.

VERIFIED COMPLAINT - 3

10. MSI employed Plaintiff as a Regional Sales Manager from September 2008 through July, 2014.

11. Mark Walker ("Walker") was MSI's Regional Sales Director and Plaintiff's immediate supervisor until he accepted a demotion to replace Plaintiff in April 2014.

12. David Gagne ("Gagne") is a Vice President at MSI and was Walker's and Plaintiff's supervisor.

13. Joseph Quenneville ("Quenneville") formerly was MSI's Channel Account Manager for the Western United States and Gagne's, Walker's, and Plaintiff's supervisor. Quenneville is expected to verify the allegations in this Complaint, including the allegation that Plaintiff earned over $1 million in commissions wrongfully withheld from him.

### MSI's Sales Incentive Plans

14. Plaintiff's compensation at MSI included incentive payments for his sales performance.

15. MSI issued annual Sales Incentive Plans ("SIP") which included individual quotas, formulae for measuring individual performance, and generally applicable provisions by which incentive payments are earned.

16. SIP participants such as Plaintiff earned incentive payments by meeting or exceeding individual annual sales quotas.

17. In February, 2013 the Company issued to Plaintiff a SIP applicable to the period beginning January 1, 2013 and ending on December 31, 2013 (the "2013 SIP").

18.    In the 2013 SIP the Company promised Plaintiff that if he met or exceeded his individual sales quotas, he would earn commissions on both orders placed and revenue generated.

## The Cox/Caesars Opportunity

19.    In 2011 Plaintiff and Quenneville identified Caesars Entertainment and its networked hotel and other properties as a unique and potentially lucrative sales opportunity.

20.    Plaintiff believed MSI could unseat Cisco Systems, Inc. ("Cisco") as Caesars' sole source networking vendor and developed a plan to gain Caesars' attention and earn its trust.

21.     Caesars hosts an annual DEFCON convention at which over fifteen thousand computer hackers trade information with journalists, computer security experts, and other digital mavens.

22.    Caesars' networks were routinely hacked by DEFCON attendees.

23.    Plaintiff approached Caesars and offered to conduct a product trial during the 2011 and 2012 DEFCON conventions. If MSI's security protocols performed adequately in this unique environment, Plaintiff would have proven MSI's abilities and expertise.

24.    The trials were an overwhelming success.

25.    Between 2011 and 2013, Plaintiff worked tirelessly to develop a relationship with Caesars and its network provider, Cox Communications.

26.     In or about October 2012, Caesars issued a WLAN Request for Proposal. Initially, MSI was not among the companies asked to respond. Plaintiff, however, successfully lobbied Caesars to add MSI to the list of respondents based on his work over the preceding year.

27.     By mid-2013 Plaintiff had earned the trust of Caesars' Director of Security Operations & Engineering, William J. Worthington.

28.     By mid-2013 due to Plaintiff's efforts, MSI was well-situated to become the architect of Caesars' network, displacing Cisco, a singular achievement for Plaintiff and MSI.

## The 2013 SIP Amendments

29.     At this time, however, MSI was facing a vexing set of problems.

30.     First, aggregate sales by the group of which Plaintiff was a member were below forecasted levels.

31.     Second, morale among the members of the group was low.

32.     Third, top sales talent was leaving the Company.

33.     Fourth, MSI's parent, Motorola, Inc., was interested in selling MSI. Each of the problems identified above was likely to decrease MSI's value in an acquisition.

34.     In order to increase sales, retain Plaintiff and its other valuable employees, boost sagging morale, and increase MSI's value, the Company amended the 2013 SIP to expand and increase incentive payments.

35.     In July 2013 the Company announced the amendments to the 2013 SIP.

36.     Among other changes,  the amendment to the 2013 SIP changed section 2.07, which specified "When Incentive Payments are Deemed Earned."

37.     Pursuant to the 2013 SIP amendment incentive payments were deemed earned when sales were achieved by way of booking an order, that is, upon receipt of an agreement signed by the Company and a customer.

38.     The 2013 SIP and the amendment are ambiguous.

39.     The Company represented to Plaintiff that the 2013 SIP amendment would benefit him by, among other things, entitling Plaintiff to incentive payments upon his obtaining an agreement signed by the Company and a customer, and in particular his obtaining an executed Statement of Work ("SOW") from Cox Communications and Caesars Entertainment.

40.     The Company represented to Plaintiff that an executed SOW from Cox Communications and Caesars Entertainment would constitute a booked order within the meaning of the amended 2013 SIP.

41.     Expected revenues of $33 million from an executed SOW from Cox Communications and Caesars Entertainment would materially increase the value of the Company.

42.     Moreover, by an executed SOW from Cox Communications and Caesars Entertainment, MSI would replace Cisco, MSI's principal competitor, as vendor.

43.     The Company made these representations with the intention that Plaintiff rely on them by remaining at MSI and focusing his efforts on obtaining an executed SOW from Cox Communications and Caesars Entertainment on or before December 31, 2013.

44.     At the time it made these representations, the Company knew they were false; the Company had no intention of awarding Plaintiff the incentive payments to which he would become entitled.

### MSI's "Bait and Switch" Incentive Program

45.     In June, 2013 Plaintiff and his sales team participated in a conference call hosted by Walker on behalf of MSI. During the call Walker admitted MSI was concerned about discontent among sales team members and attrition among its top sales people. Walker asked anyone considering leaving MSI agree to "talk with him first."

46.     A few weeks later MSI conducted an "all-hands" conference call to announce amendments to the 2013 SIP. MSI represented that incentive payments would no longer be based on orders. Instead, participants would be eligible for incentive payments upon a booked order. MSI represented that the change would increase and accelerate incentive payments to SIP participants.

47.     During and after the "all hands" meeting, the Company provided no documentation as to application of the newly revised SIP. However, both Gagne and Walker, on behalf of the Company, represented that Plaintiff's commissions would increase as compared to the original SIP and, further, that Plaintiff would earn the increased commissions upon finalizing the Caesars/Cox Statement of Work.

48.     Walker, on behalf of MSI, represented to Plaintiff: "Don't worry about [definitions], you'll get paid a small fortune under this new plan if you bring the Caesars deal in" before the end of the year. By "bring[ing] the Caesars deal in" Walker meant obtaining a

signed agreement to sole source network design, equipment, installation, and maintenance through MSI.

49. At the time Walker made the representation to Plaintiff, Walker knew that "bringing in" Caesars meant obtaining a signed agreement to sole source network design, equipment, installation, and maintenance with MSI. Walker knew that purchase orders and payment for equipment and services by Caesars could not be obtained in 2013.

50. Walker made the representation to Plaintiff in order to persuade Plaintiff to (a) devote all of his sales efforts to obtaining the SOW before the end of 2013, to the exclusion of other sales opportunities, and (b) continue working for MSI.

51. In reliance on Walker's representations, Plaintiff focused all of his efforts on obtaining a signed SOW before the end of 2013.

52. In reliance on Walker's representations, Plaintiff turned down other employment opportunities, including employment by Cisco, which was actively trying to recruit him.

53. The next critical event in Plaintiff's efforts to book a sale to Cox/Caesars would be the August, 2013 DEFCON convention. In order to obtain a signed SOW in 2013, Plaintiff would have to demonstrate MSI's network architecture, software, and equipment was secure.

## Plaintiff Delivers the Caesars/Cox Booking

54. As a direct result of Plaintiff's diligence, MSI's performance at DEFCON 2013 exceeded even the most optimistic expectations: Caesars' network proved impenetrable to some of the most skilled hackers in the world.

55.     Immediately after DEFCON 2013, negotiations between MSI, Caesars, and Cox intensified. Technical, legal, management, and sales representatives of the three parties participated in weekly meetings and conference calls to identify, develop, and negotiate contract deliverables.

56.     During December 2013 work on the SOW intensified further, with the companies communicating on a daily basis, including conference calls and drafting sessions on Christmas Eve and Christmas Day.

57.     Plaintiff's work bore fruit on New Year's Eve: All three companies executed the SOW, with the final execution by Caesars just before 7 PM.

58.     In an email sent at 6:55 PM on December 31, 2013, Quenneville announced the deal, correctly giving primary credit to Plaintiff. He stated that "the Caesars agreement with Cox/Hospitality Network has been signed…" and the "deal is a $100M once in a lifetime win…." He concluded the email by stating "**Now that [the deal] is closed** we can all celebrate a win…." (emphasis added).

59.     Plaintiff had thereby booked a $33 million order for MSI.

60.     Plaintiff was eligible for incentive compensation in accordance with the amended 2013 SIP and/or in accordance with MSI's express representations.

61.     Plaintiff had relied on MSI's representations, working on the SOW to the exclusion of other sales opportunities and bypassing other employment opportunities.

62.     Two days later MSI, through Gagne and Walker, began the process of reneging on its promise to Plaintiff while at the same time continuing to assure him he would receive

his earned commissions. In fact, Gagne and Walker intended to deprive Plaintiff of his earned compensation and instead appropriate the benefits for themselves.

### MSI Reneges on its Promises

63.     Had MSI revealed its intention to breach the commission agreement it would have risked Plaintiff resigning. Given Plaintiff's importance to Caesars, and Mr. Worthington in particular, his resignation would have endangered MSI's nascent relationship with Caesars. In fact, months later when MSI revealed to Caesars that Plaintiff had been "transitioned" off of the Caesars team, Caesars strongly objected and pressured MSI to reconsider.

64.     Upon information and belief, had the Caesars booking been jeopardized in any way during the first quarter of 2014, Motorola's sale of the MSI to Zebra would have been adversely affected.

65.     So, Walker on behalf of MSI repeatedly assured Plaintiff he would be paid his commission on the SOW, even going so far as to calculate the commission in a writing in which he refers to the SOW as the "Caesars Booking: $32,428,798."

66.     On January 2, 2014, Gagne sent an email "summarizing" the "contract we signed on 1/31/13 (sic) with Cox." In that email Gagne states "Remember, this is not a booking." He cites no authority for that statement, which contradicts MSI's representations to Plaintiff.

67.     Upon information and belief, Gagne's statements are contrary to representations Motorola, Inc., made to Zebra Technologies ("Zebra") in connection with its acquisition of MSI.

68.     Walker had discussions with Gagne after Gagne's email was sent out, because Walker was aware that Motorola did not stipulate or document what constituted a booked order, beyond what was promised at the all hands meetings. Walker assured Plaintiff that Gagne's email would not affect his entitlement to a commission. Walker represented to Plaintiff that MSI would certainly pay him the commission he had earned when the SOW was signed.

69.     The following month, in February 2014, Walker again assured Plaintiff he would receive his commission based on the SOW. Walker represented that Gagne confirmed Plaintiff would receive his commission based on the SOW.

### MSI Reveals its Duplicity

70.     By March 2014, two things had occurred. First, a contract for the sale of MSI to Zebra had all but been signed. Second, MSI had begun performance under the SOW, making it less likely Caesars would attempt to cancel the SOW if Plaintiff were removed from the Caesars relationship.

71.     In March, Walker called Plaintiff and told him MSI shortly would make a series of announcements regarding sales and organizational changes which Plaintiff "would not like."

72.     Walker finally admitted knowing that MSI did not intend to pay Plaintiff the commission he had been repeatedly promised. Walker admitted Plaintiff was the most deserving sales representative on the Caesars deal and stated his belief that Plaintiff is owed the commission.

73.     Walker also admitted that Gagne had told him Plaintiff would not receive the commission he had earned. Walker admitted MSI's actions were "unfair and unjust."

74.     In April 2014 Motorola announced the sale of MSI to Zebra.

75.     Also in April, MSI informed Plaintiff he would be "transitioned off of the Caesars account within ninety days."

76.     Gagne informed Caesars he will be "taking over the account" and that Plaintiff "is no longer on my team."

77.     As expected, when Caesars was informed it will be losing access to Plaintiff, Caesars strongly objected and sent several emails asking MSI to reverse its decision.

78.     Mr. Worthington stated Caesar's would not have signed the SOW had it known Plaintiff would not be a permanent part of the relationship. He states:

> Although I understand that changes are made in organizations. **I don't understand why this change is happening right before we are starting a huge wireless deployment.** Garry is our trusted security advisor on your team and I do not have any working relationship with anyone else. DDS is not willing to risk having a new Motorola team giving security recommendations without having some overlap and understanding of our environment.
>
> **The partnership Garry fostered over the last three years with DDS at DEFCON is the reason Motorola was given the opportunity to proof its solution and in the end win our business. I questions why this partnership is being put at risk?**

79.     Around this time Walker and Plaintiff met at a nearby Starbucks. Walker agreed, and admitted Gagne agreed, that MSI "screwed [Plaintiff] out of his commission." Walker advised Plaintiff to retain an attorney, stated his belief that Plaintiff has a "strong case against MSI for breach of contract," and prepared a written calculation of the commissions MSI owed Plaintiff as a result of the "Caesars Booking." Walker again stated his view that non-payment of Plaintiff's commission was unjust, unfair, and illegal, and stated that in private

conversations between them Gagne agreed. Walker also stated that Gagne "would understand if [Plaintiff] resigned" from MSI on account of MSI's treatment of him.

80. Instead, Plaintiff continued to fulfill his commitment to Caesars during the "transition" period.

81. By June 2014, because Plaintiff had failed to resign, Gagne transferred Plaintiff to a new division at MSI. Plaintiff accepted the position because pursuant to the 2013 SIP, he was entitled to receive commissions from revenues generated by performance of the SOW.

82. Even that commitment by MSI turned out to be worthless. The Company announced changes to the SIP retroactive to January 1, 2014. The changes eliminated incentive payments based on revenues, thus depriving Plaintiff of his remaining earned commissions.

83. Meanwhile, Walker accepted a demotion from Regional Sales Director to Regional Sales Manager. Doing so entitled Walker to share in commissions from Caesars orders under the new SIP.

84. As a result of the Company's unlawful conduct, working conditions had become intolerable for Plaintiff, and he was forced to resign.

85. MSI and its successor, Zebra, are jointly and severally liable to Plaintiff for the acts and damages complained of herein.

## COUNT ONE
## BREACH OF CONTRACT

83. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

84. The 2013 SIP, as amended, is an enforceable agreement between Plaintiff and MSI.

85.    MSI offered to pay Plaintiff commissions should he obtain a signed statement of work prior to December 31, 2013. Plaintiff accepted that offer.

86.    Plaintiff's consideration included remaining employed by MSI and turning down alternative offers of employment.

87.    Plaintiff fully performed each and every duty owed MSI under the agreement.

88.    MSI breached the agreement by failing to pay Plaintiff commissions he had earned by delivering a fully executed Statement of Work in a timely manner.

89.    As a direct, proximate, and foreseeable result of MSI's breach of the agreement, Plaintiff has suffered and will continue to suffer damages.

90.    Defendants are jointly and severally liable for such damages.

**COUNT TWO**
**BREACH OF THE IMPLIED**
**COVENANT OF GOOD FAITH AND FAIR DEALING**

91.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

92.    MSI and Plaintiff entered into a contractual relationship wherein a covenant of good faith and fair dealing was implied under California law.

93.    MSI, through the conduct alleged herein, failed to exercise good faith in the performance of the agreement.

94.    MSI acted in bad faith to prevent Plaintiff from realizing the benefits of the agreement; that is, MSI lied, misled, and otherwise prevented Plaintiff from receiving any of the commissions he had earned.

95.     As a direct, proximate, and foreseeable result of MSI's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and will continue to suffer damages.

96.     Defendants are jointly and severally liable for such damages.

## COUNT THREE
## FRAUD

97.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

98.     MSI represented to Plaintiff that he would earn a sales commission if he delivered a fully executed Statement of Work on or before December 31, 2013.

99.     MSI made the representation with the intention of inducing Plaintiff's reliance by, *inter alia*, turning down alternative offers of employment and focusing all of his efforts on delivering a fully executed Statement of Work on or before December 31, 2013.

100.    At the time MSI made that representation to Plaintiff, MSI had no intention of paying Plaintiff the commissions promised to him.

101.    Plaintiff relied on MSI's representations by turning down alternative offers of employment and focusing all of his efforts on delivering a fully executed Statement of Work on or before December 31, 2013, to the exclusion of other commission generating opportunities.

102.    It was reasonable for Plaintiff to rely on the representations of his immediate superiors at MSI and he had no reason to suspect they were misleading and lying to him.

103.    As a direct, proximate, and foreseeable result of MSI's fraudulent misrepresentations, Plaintiff has suffered and will continue to suffer damages.

104.   Defendants are jointly and severally liable for such damages.

## COUNT FOUR
## PROMISSORY ESTOPPEL

105.   Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth herein, except for allegations of a contract between MSI and Plaintiff.

106.   MSI promised Plaintiff he would receive commissions if he delivered a fully executed Statement of Work on or before December 31, 2015.

107.   MSI intended that Plaintiff rely on its promise.

108.   Plaintiff reasonably relied on MSI's promise to his detriment by, *inter alia*, turning down alternative offers of employment and focusing all of his work efforts on delivering the fully executed Statement of Work in a timely fashion, to the exclusion of other commission generating opportunities.

109.   MSI failed to perform in accordance with its promise, entitling Plaintiff to equitable relief.

110.   Defendants are jointly and severally liable for such damages.

**WHEREFORE**, Plaintiff respectfully requests this Honorable Court enter judgment in his favor and against Defendants, including the following:

A.   A declaration that Motorola breached the Employment Agreements;

B.   Compensatory damages exceeding $1 million, in an amount to be proven at trial;

C.   Pre-judgment interest on the amounts due Plaintiff;

D.   An award to Plaintiff of his attorneys' fees and expenses pursuant to Cal. Lab. Code § 218.5;

E.      An award of punitive damages; and

F.      Such other relief as this Honorable Court deems just and proper.

July 17, 2015                                      Respectfully submitted,


                                                  **/s/ Richard Grimm**
                                                  Richard Grimm

                                                  *Attorney for Plaintiff Garry Drummond*

## **VERIFICATION OF COMPLAINT**

I, Garry Drummond, am Plaintiff named in the foregoing Complaint, and the facts and allegations stated therein are true, except so far as they are stated to be on information and belief, in which case I believe them to be true. I declare under penalty of perjury according to the laws of the State of California that the foregoing is true to the best of my knowledge, information, and belief.

July 7, 2015

Garry Drummond